IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN THE MATTER OF THE
EXTRADITION OF HUZEFA HAFIZ                No. 4:24-MJ-656-BP
ISMAIL

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF EXTRADITION

The United States, by and through the undersigned counsel, respectfully requests that the Court certify to the Secretary of State that **Huzefa Hafiz Ismail** can be extradited to France. An extradition hearing is currently scheduled for February 11, 2025, at 9:00 a.m.

The United States seeks **Ismail's** extradition to France in accordance with its obligations under its treaty with France. *See* Extradition Treaty Between the United States of America and France, U.S.-Fr., Apr. 23, 1996, S. TREATY DOC. NO. 105-13 (1997), *and* the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and France signed 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. TREATY DOC. NO. 109-14 (2006) (together, the "Treaty"). France seeks **Ismail's** extradition so that he may be prosecuted for (1) money laundering, in violation of Article 222-38 of the French Criminal Code; (2) serious money laundering, in violation of Article 324-2 of the French Criminal Code; and (3) participation in a criminal conspiracy with the view to the preparation of a crime, participation in a criminal conspiracy with the view to the

Government's Memorandum in Support of Extradition – Page 1

preparation of an offense sanctioned by 10 years' imprisonment, and participation in a criminal conspiracy with the view to the preparation of an offense sanctioned by at least 5 years' imprisonment, in violation of Article 450-1 of the French Criminal Code.[1] On July 30, 2024, Julien Gau, Vice-President in charge of the investigation, of the Paris Tribunal Judiciaire, a judicial officer authorized by French law to issue warrants of arrest, issued a warrant in France for **Ismail**'s arrest for these offenses.

By statute, this Court is required to hold a hearing to consider the evidence of criminality presented by France and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the Court finds **Ismail** extraditable, it must certify that finding to the Secretary of State, who will make the ultimate surrender decision. *See* 18 U.S.C. §§ 3184, 3186.

In this case, the requirements for certification have been met. First, this Court is authorized to conduct the extradition proceeding. Second, this Court has jurisdiction over **Ismail**. Third, the Treaty is in full force and effect. Fourth, the offenses for which **Ismail**'s extradition is sought are covered by the Treaty. Finally, there is probable cause to believe that **Ismail** committed the charged offenses. Accordingly, the United States requests that the Court certify **Ismail**'s extradition to France for the Secretary of State's consideration.

---

[1] France requested **Ismail**'s extradition on additional charges, and the United States' decision to proceed on these select charges is without prejudice to proceeding on additional charges.

I.    **PROCEDURAL BACKGROUND**

On August 25, 2024, United States Magistrate Judge Hal R. Ray, Jr. issued a warrant for the provisional arrest of fugitive **Huzefa Hafiz Ismail** pursuant to a request from France under authority of its extradition treaty with the United States and 18 U.S.C. § 3184 *et seq.*  On August 26, 2024, U.S. law enforcement arrested **Ismail** in this District, and **Ismail** made an initial court appearance on August 27, 2024.

The court initially ordered **Ismail** detained and set a detention hearing for September 3, 2024, but then, upon **Ismail's** motion, canceled the hearing. Dkt. 10-12. On October 21, 2024, France submitted a full formal extradition request to the United States. On October 28, 2024, **Ismail** filed a set of motions for bail, Dkt. 15-16, which the government opposed. Dkt. 17. **Ismail** filed a second motion for bail on November 26, Dkt. 19, which the government also opposed. Dkt. 21. The Court denied the first motion (Dkt. 15-16) and gave a deadline for **Ismail** to file a reply to the government's opposition to his second motion for bail. Dkt. 22. **Ismail** then requested an extension of time to file the reply brief, Dkt. 24, which the Court granted, giving **Ismail** until January 13, 2025. Dkt. 25. **Ismail** never filed a reply brief.

On January 16, 2025, the government filed a notice with the Court attaching a redacted copy of France's formal extradition request. Dkt. 27. The Court set the extradition hearing for February 11, 2025. Dkt. 28.

## II.     APPLICABLE LAW

### A.  The role of the Judge in extradition proceedings

During an extradition hearing, the Court's role under 18 U.S.C. § 3184 is limited to determining whether the following five requirements to certify the fugitive's extraditability to the Secretary of State are satisfied:  (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers the offenses for which extradition is requested; and (5) there is sufficient evidence to support a finding of probable cause as to each offense for which extradition is sought. Specifically, the Court must determine whether France has presented evidence "sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184.

The evidence must merely establish probable cause that the fugitive committed the offenses for which extradition is sought. If the Court finds that probable cause exists, and the remaining four requirements are met, it must certify as much to the Secretary of State, who will make the final determination regarding the fugitive's extradition. 18 U.S.C. § 3184 (providing that the court "shall" certify the same to the Secretary). In the extradition context, the Fifth Circuit has explicated the probable cause standard as asking whether there is "the existence of a reasonable ground to believe the accused guilty of the crime charged." *Garcia-Guillern*, 450 F.2d 1189, 1192 (5th Cir. 1971); *see also Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980); *In re Extradition*

*of Garcia*, 825 F. Supp. 2d 810, 829 (S.D. Tex. 2011) ("[T]he extradition hearing is akin to a preliminary hearing under Federal Rule of Criminal Procedure 5.1, and is not a trial on the merits to determine whether the accused is guilty or innocent of the underlying criminal allegations.").

An extradition proceeding "is not a criminal proceeding," *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993), and "[t]he magistrate does not inquire into the guilt or innocence of the accused," *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Benson v. McMahon*, 127 U.S. 457, 463 (1888) ("[T]he proceeding before the [extradition judge] is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him"); *Arias v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused." (internal quotation marks and citation omitted)). Rather, the government must show only "probable cause that the fugitive is guilty." *Kastnerova*, 365 F.3d at 987 (internal quotation marks omitted); *see also*, *e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

"The power to extradite derives from the President's power to conduct foreign affairs." *Martin*, 993 F.2d at 828 (citing U.S. Const. art. II, § 2, cl. 2). Thus, extradition

is primarily an executive responsibility. Nevertheless, the Executive delegates "an independent review function" to the judiciary, as defined by the extradition statute. *Id*. The judicial officer presiding over a Section 3184 extradition hearing therefore does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). The extradition statute authorizes a judicial officer to exercise this special authority to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see also Kastnerova*, 365 F.3d at 987; *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014).

At the extradition hearing, a court's role is to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification are satisfied. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000). If the court finds that the requirements for certification have been met, the court must furnish a certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (if the requirements are met, the judicial officer "shall certify the same" and "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828. The Secretary of State, and not the Court, decides

whether the fugitive should ultimately be surrendered to the requesting country. *See* 18

U.S.C. § 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th Cir. 1983) (explaining

that the "ultimate decision to extradite . . . is reserved to the President and, by a limited

delegation of authority, to the Secretary of State").

**B.  Procedures during the extradition hearing**

    *i.  An extradition hearing is not a criminal proceeding*

As noted above, an extradition hearing is not a criminal proceeding.  Its purpose is

to decide whether sufficient evidence supports the foreign charges under the applicable

treaty, not to determine the guilt or innocence of the accused.  *Collins*, 259 U.S. at 314–

15. A fugitive's guilt or innocence is determined by a foreign court through "a trial

according to the modes established in the country where the crime was committed[.]"

*Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see also Haxhiaj v. Hackman*, 528 F.3d 282,

292 (4th Cir. 2008) ("Determining the ultimate guilt of the accused, therefore, is a

function committed to the justice system of the requesting country.").

    *ii.  Usual constitutional rights and criminal procedures do not apply to
extradition proceedings*

Given the unique and limited nature of extradition proceedings, and the United

States' international obligations under extradition treaties, limited procedural and

evidentiary rules apply to extradition hearings. By their express terms, neither the

Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to

extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by

these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid.

**Government's Memorandum in Support of Extradition – Page 7**

1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").

Nor is the fugitive entitled to certain rights normally attendant criminal proceedings in the United States. Because extradition hearings "are not to be converted into a dress rehearsal trial," a fugitive's rights to discovery and to present evidence are severely constrained. *Cf. Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (upholding denial of discovery); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (same); *Shapiro v. Ferrandina*, 478 F.2d 894, 900–01 (2d Cir. 1973) (explaining that a judicial officer may properly exclude "evidence of alibi," "facts contradicting the demanding country's proof," or proof of a defense).

The circumscribed nature of extradition proceedings limits the fugitive's opportunity to challenge the evidence introduced against him. For example, a fugitive's "right to introduce evidence is . . . limited to testimony which *explains* rather than contradicts the demanding country's proof." *Shapiro*, 478 F.2d at 905 (internal quotation marks and citation omitted) (emphasis added); *see also, e.g.*, *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (internal quotation marks, citation, and emphasis omitted); *Collins*, 259 U.S. at 315-17; *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993). A contrary rule might compel the "demanding government to produce all its evidence . . . both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (citation omitted). The

admission of such explanatory evidence is largely within the discretion of the Court. *E.g.*, *Matter of Extradition of Ben-Tov*, 2006 WL 8463565, at \*2 (S.D. Fla. Feb. 27, 2006); *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315–17).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (rejecting objections that "savor of technicality"); *Shapiro*, 478 F.2d at 901 (citing *Charlton*, 229 U.S. at 456). "And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses." *Martinelli*, 2017 WL 3776953, at \*9 (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *see also*, *e.g.*, *Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (en banc) (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence); *Shapiro*, 478 F.2d at 905 (evidence that would pose conflict of credibility "should properly await trial in Israel"); *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). Such issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve.

Moreover, the fugitive's constitutional rights are limited. For example, the fugitive has no right to cross-examine a witness who might testify, *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); there is no right for the fugitive to confront his accusers, *id.* (citing *Bingham*, 241 U.S. at 517); there is no right to a speedy extradition, *Martin*, 993 F.2d at 829; and the Fourth Amendment's exclusionary rule is

not applicable, *Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980).

> iii. *Extradition hearings rely on written submissions and do not require live witnesses.*

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information that the foreign government requesting extradition has provided. *See, e.g.*, *Shapiro*, 478 F.2d at 902; *cf. Collins*, 259 U.S. at 317 (noting that "unsworn statements of absent witnesses may be acted upon" even if such statements would ordinarily be prohibited). Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Nor does a judicial officer's reliance on written documentation implicate the rule against hearsay because hearsay evidence is admissible at an extradition hearing and may fully support the court's findings leading to a certification under § 3184. *See Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see also Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment).

The Treaty governs the certification of documents introduced during an extradition hearing. Article 11 of the Treaty, as amended, provides that documents bearing "the certificate or seal of the Ministry of Justice, or Ministry or Department

responsible for foreign affairs, of the requesting State shall be admissible in extradition proceedings in the requested State without further certification, authentication, or other legalization." Here, France has complied with the Treaty's requirements for authentication by submitting documents that bear the certificate or seal of the French Ministry of European and Foreign Affairs. Thus, the documents provided by France are admissible in these proceedings.

> iv. *There is a rule of non-inquiry: The Executive considers all matters other than sufficiency.*

In extradition proceedings, the rule of non-inquiry "precludes courts from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request. . . . [Courts] have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch." *Arias*, 928 F.3d at 1295. In other words, a judicial officer reviews only the sufficiency of the evidence, *see* 18 U.S.C. § 3184, and the Court is "bound by the existence of an extradition treaty to assume that the trial" in the requesting state "will be fair," *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911); *see also Martinelli*, 2017 WL 3776953, at *28-29. All other matters fall within the ambit of the Executive's power to conduct foreign affairs. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d

Cir. 1997); *see also Hurtado v. U.S. Atty. Gen.*, 401 F. App'x 453, 456 (11th Cir. 2010). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the Executive's prerogative. *In re Kaine*, 55 U.S. 103, 110 (1852); *see also Martin*, 993 F.2d at 828.

## III.  **THE REQUIREMENTS FOR CERTIFICATION ARE MET HERE**

In this case, the requirements for certification under 18 U.S.C. § 3184 have been met.  First, this Court is authorized to conduct the extradition proceeding.  Second, this Court has jurisdiction over **Ismail**.  Third, the Treaty is in full force and effect.  Fourth, the offenses for which **Ismail's** extradition is sought are covered by the Treaty.  Finally, there is probable cause to believe that **Ismail** committed the charged offenses. Accordingly, the United States respectfully requests that the Court certify **Ismail's** extradition to France for the Secretary of State's consideration.

### A.  **The Court is authorized to conduct extradition proceedings**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184; *see also* 28 U.S.C. § 636; *Noel v. United States*, 12 F. Supp. 2d 1300, 1305 (M.D. Fla. 1998); *see generally Ntakirutimana*, 184 F.3d at 423 n.8 (5th Cir. 1999)

("The judicial officer, whether state or federal, who is authorized to hold an extradition hearing pursuant to the terms of 18 U.S.C. § 3184 is often referred to as a 'magistrate' or as the 'committing court.'").  The Court therefore is authorized to conduct this extradition proceeding.

### B.  The Court has jurisdiction

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."). **Ismail** was arrested on France's provisional arrest request at DFW Airport, which is in the Northern District of Texas. Thus, the Court has jurisdiction over **Ismail**.

### C.  The Treaty is in full force and effect

Extradition is appropriate when a treaty or convention is in full force and effect between the requesting state and the United States.  18 U.S.C. § 3184; *see also Kastnerova*, 365 F.3d 980, 987 (11th Cir. 2004) (dismissing habeas petition challenging certification of extradition, because, among other reasons, district court did not err in determining extradition treaty to be valid).

Here, an Attorney Adviser in the Office of the Legal Adviser for the Department of State submitted a declaration (the "State Department Declaration") attesting that the Treaty is in full force and effect between the United States and France.  *See* Dkt. 27-1 at 2 ¶ 2. When determining whether a treaty is in full force and effect, a court defers to the

determination of the Department of State. *See Terlinden v. Ames*, 184 U.S. 270, 288

(1902); *Charlton*, 229 U.S. at 468; *Arias*, 928 F.3d at 1288 ("[C]ourts *must* defer to the

determination of the executive branch in deciding whether an extradition treaty remains

in force.") (emphasis in original, internal quotation marks omitted).

### D. <u>The offenses for which Ismail's extradition is sought are covered by the Treaty</u>

An extradition treaty creates an obligation for the United States to surrender

fugitives under the circumstances the treaty specifies. Here, Article 1 of the Treaty

provides for the extradition of "persons whom the competent authorities in the

Requesting State have charged with or found guilty of an extraditable offense." Dkt. 27-

1 at 20. Article 2(1) of the Treaty further states, in relevant part, that "[a]cts shall be

extraditable if they are punished under the laws in both States by deprivation of liberty

for a maximum of at least one year or by a more severe penalty." *Id.* Also, pursuant to

Article 2(3) of the Treaty, an offense is extraditable regardless of whether (a) "the laws

in the Contracting States place the offense within the same category of offenses or

describe the offense by the same terminology;" or (b) "the offense is one for which

United States federal law requires proof or an element of proof, such as passage from

one state to another, the use of the mails, wire, and other facilities of interstate or foreign

commerce, or the effects upon such commerce, since such an element is required for the

sole purpose of establishing the jurisdiction of United States federal courts." *Id.* at 20-

21. France requests **Ismail's** extradition so that he may be prosecuted for three offenses:

(1) money laundering, (2) serious money laundering, and (3) criminal conspiracy. All of

these offenses are extraditable under the Treaty.

In assessing whether the Treaty covers the offenses for which France seeks extradition, the Court should examine the description of criminal conduct France has provided and determine whether that conduct, if it had been committed in the United States, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 60–61 (1903); *Arias*, 928 F.3d at 1292-93; *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). This is commonly referred to as the dual criminality requirement.

A requesting country need not establish that its crimes (or the elements of the crimes) are identical to crimes in the United States. *Zhenli Ye Gon*, 774 F.3d at 217 (collecting cases). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. Thus, the fact that the foreign offense may be broader than its U.S. analogue, or vice versa, does not defeat dual criminality. *See Arias*, 928 F.3d at 1293 (citing *Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008)); *see also, e.g.*, *id.* ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.") (internal quotation marks and citation omitted); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the

conduct charged.").

In fulfilling its function under § 3184, the Court should construe liberally the applicable extradition treaty to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 293, 303 (1933). Because extradition treaties should be "interpreted with a view to fulfil[l] our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court "must approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981). *Cf. Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition[.]").

**Ismail**'s conduct, as described in the documents France provided, satisfies the Treaty's dual criminality requirement.

First, the State Department Declaration provides that "[t]he offenses relating to money laundering and criminal conspiracy for which extradition is sought are covered under Article 2 of the [Treaty]." Dkt. 27-1 at 2 ¶ 5. The Department of State's determination that a fugitive's conduct is covered by a treaty is entitled to deference from the Court. *Factor*, 290 U.S. at 295; *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

Second, as set forth in the extradition request, the French money laundering and

criminal conspiracy offenses are punishable in France by terms of imprisonment exceeding one year. Dkt. 27-1 at 90-102. Specifically, the extradition request sets out that, under French law, the money laundering charges for which France seeks **Ismail**'s extradition are punishable by a maximum term of imprisonment of 10 years or 30 years; and the criminal conspiracy charges for which France seeks **Ismail**'s extradition are punishable by a maximum term of imprisonment of 5 years or 10 years. *Id.*

Third, the conduct underlying France's charges would be sufficiently punishable had it been committed in the United States. For example, with respect to the money laundering counts, **Ismail**'s alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under 18 U.S.C. § 1956 (laundering of monetary instruments) or 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), whose maximum terms of imprisonment are 20 years and 10 years, respectively.[2] With respect to the

---

[2] 18 U.S.C. § 1956(a)(1)(A)(i) provides: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

18 U.S.C. § 1956(a)(1)(B) provides: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

18 U.S.C. § 1957 criminalizes conduct where a person "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and [that] is derived from specified unlawful activity."

**Government's Memorandum in Support of Extradition – Page 17**

criminal conspiracy counts, **Ismail**'s alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under 18 U.S.C. § 1956(h) or 18 U.S.C. § 371, which charge carries a maximum term of imprisonment of 20 or 10 years,[3] or 5 years, respectively.

Fourth, as stated in the extradition request, the statute of limitations in France on the charged crimes has not expired. *See* Dkt. 27-1 at 75.

Accordingly, the Treaty covers the offenses for which France seeks extradition.

## E.  France's submissions establish probable cause to believe that Ismail committed the offenses

The information submitted by France establishes probable cause to believe that **Ismail** committed the charged offenses. According to France's extradition request, on or about March 9, 2021, French authorities, in collaboration with other countries, dismantled the encrypted messaging application SkyECC based on SkyECC being used exclusively to facilitate activities related to organized crime. Upon analysis of intercepted encrypted text messages sent over SkyECC, French authorities identified a communication between SkyECC users "3DOR3D" and "ED8988" that appeared to relate to a pickup of "900K" in Paris. Investigation revealed exchanges between these users on SkyECC related to the collection of funds that were the proceeds of drug trafficking. Further analysis of the SkyECC communications of user 3DOR3D, who

---

[3] 18 U.S.C. § 1956(h) provides: "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Thus, the maximum term of imprisonment for conspiracy to violate § 1956(a)(1)(A) or (B) is 20 years, and the maximum for conspiracy to violate § 1957 is 10 years.

used the SkyECC name "CEO-DARKBANK," revealed that CEO-DARKBANK acted as a broker or a financial intermediary to launder the proceeds of drug trafficking or other unlawful operations. Specifically, CEO-DARKBANK would collect the illicit funds and transmit them to third parties. The third parties, after taking a commission of the funds, would then credit the funds in cryptocurrency to various cryptocurrency wallets used by CEO-DARKBANK. French authorities' analysis of the SkyECC communications of CEO-DARKBANK revealed communications between CEO-DARKBANK and SkyECC users DNFNVD (who used the name "Tibu") and VRHDIV (who used the name "Lambo"), in which they discussed "stuff" in Costa Rica and Panama and exchanged a photograph of a slab of cocaine. In addition, the French investigation of SkyECC messages, revealed, among other things:

- Communications on or about October 16, 2020, indicating that CEO-DARKBANK participated as an intermediary in the acquisition of 500 kilograms of cocaine stored in Costa Rica, as well as the financing for these narcotics in Sao Paolo, Brazil, on behalf of Lambo. That day, Lambo wrote to CEO-DARKBANK, "is any stuff in costa rica?" That same day, Tibu wrote to CEO-DARKBANK, asking CEO-DARKBANK to give him a token and a telephone number for the "stuff" in Costa Rica and to send him money. Lambo then asked CEO-DARKBANK to send him the logo and a photo of the product. Tibu sent CEO-DARKBANK a photograph of a loaf of cocaine with the logo "R=67." CEO-DARKBANK sent this photograph to Lambo and told him to take a look. Then, Lambo explained to CEO-DARKBANK

**Government's Memorandum in Support of Extradition – Page 19**

that he had a man who would "go empty" because the amount of cash was equivalent to two bags, and that another individual would drop off the first individual near the address because he did not want to communicate too close to the house. CEO-DARKBANK and Lambo then communicated regarding currency conversions, and Lambo informed CEO-DARKBANK that "all 500" had the same logo. Lambo also instructed CEO-DARKBANK to pay the amount owed in Brazil.

- Communications on or about July 22, 2020, between CEO-DARKBANK and SkyECC user FD97E9 (who used the name "Patek"), in which Patek wrote that the Colombian group he was dealing with did not like circulating photographs of their product, that he needed 28 million pesos from Medellin and Cucuta, and that CEO-DARKBANK should tell his network that a sample could be taken and that the merchandise had been sold quickly by another network. The next day, Patek wrote to CEO-DARKBANK that the merchandise had been sold because "they" had liked the sample, and that there would be "500 more" that week.

- Communications on or about September 3, 2020, between CEO-DARKBANK and Tibu, in which Tibu sent CEO-DARKBANK a photograph of a slab of drugs with a logo "Z20" and offered that CEO-DARKBANK's "mates" could take the merchandise.

- Communications on or about September 8, 2020, between CEO-DARKBANK and Patek, in which Patek informed CEO-DARKBANK of the arrival of "700 bits" in

Costa Rica. Patek also sent CEO-DARKBANK a photograph of a slab of drugs with a logo "3R" and wrote that he was waiting for the price.

- Communications between CEO-DARKBANK and SkyECC user JFLSQC, who was identified by Belgian police as Jamal Bouaouiouich, a known drug trafficker.

- A communication on or about June 22, 2020, between CEO-DARKBANK and SkyECC user 4UI343, in which 4UI343 organized the transmission of drug trafficking proceeds to an individual or individuals named "Rocket" and asked CEO-DARKBANK to collect the funds related to this transaction. CEO-DARKBANK and 4UI343 also exchanged photographs showing the series numbers of bank notes to confirm that the funds were received, and they communicated regarding cash collection in the United Kingdom.

- A communication on or about July 25, 2020, between CEO-DARKBANK and SkyECC user ED8988 (who used the name "BAZ"), in which they organized a cash delivery in the amount of hundreds of thousands of euros.

- Communications between on or about November 26, 2020, and November 27, 2020, between CEO-DARKBANK and SkyECC user 7MXVLD (who used the name "Cheese ralph"), in which they arranged a collection of funds in Paris in the amount of approximately 800,000 euros. CEO-DARKBANK informed Cheese ralph that he could offer Cheese ralph a rate of 6%. They exchanged numbers for the issuance of the funds. Subsequently, CEO-DARKBANK informed Cheese ralph that the operation had been carried out.

**Government's Memorandum in Support of Extradition – Page 21**

- Communications between CEO-DARKBANK and SkyECC user BA69AQ (who used the name "the QB" or "QUARTER BACK"), in which CEO-DARKBANK issued instructions for cash payments or payments to cryptocurrency wallets used by CEO-DARKBANK, and the users exchanged screen shots depicting cryptocurrency tokens and deposit addresses.

Based on their analysis of CEO-DARKBANK's SkyECC communications, French authorities identified cryptocurrency wallets used by CEO-DARKBANK. Among other things, investigators found that, between on or about June 20, 2020, and April 5, 2021, CEO-DARKBANK used one of the wallets to send or receive approximately $284 million. Further, analysis of the transactions revealed that the wallet was used as a transaction hub, facilitating financial transactions between payors of Russian, Ukrainian, and Turkish nationalities and beneficiaries of Colombian nationality, through intermediaries residing in the United Arab Emirates. CEO-DARKBANK shared the private key for this wallet in a SkyECC messaging group and organized the shared management of the wallet by various SkyECC users, including QUARTER BACK.

The French investigation further established that **Ismail** was the user of the CEO-DARKBANK SkyECC account. For example:

- French authorities identified through an analysis of SkyECC messages that CEO-DARKBANK had spent time in Turkey and had flown from Dubai to Istanbul on

February 14, 2021, and returned to Dubai on February 22, 2021.[4] Based on information French authorities obtained from the Emirates airline, they matched the Dubai-Istanbul trip with records for **Ismail** flying on his United States passport.[5]

- In SkyECC messages reviewed by French authorities, CEO-DARKBANK revealed the approximate date he had a baby born.[6] French authorities obtained information from Amadeus, a technology provider to the travel industry, that confirmed **Ismail** had a child born around that same date, who had traveled with **Ismail** on several occasions.[7]

- In SkyECC messages reviewed by French authorities, CEO-DARKBANK revealed he had a Russian wife or ex-wife.[8] French authorities obtained information through law enforcement cooperation that confirmed **Ismail** had a Russian girlfriend.[9]

- French authorities' analysis of CEO-DARKBANK's SkyECC messages revealed that CEO-DARKBANK had posted several photos of what appeared to be him driving a Mercedes G63, as identified through the vehicle's unique air intake and red interior stitched with rhombuses.[10] French authorities obtained information

---

[4] *See* Dkt. 27-1 at 66.

[5] *See id.* at 67.

[6] *See id.* at 67-68.

[7] *See id.* at 68-70.

[8] *See id.* at 70.

[9] *See id.*

[10] *See id.* at 54-58, 71.

Government's Memorandum in Support of Extradition – Page 23

through law enforcement cooperation that confirmed **Ismail** owned luxury vehicles, including a Mercedes G63.[11]

- French authorities identified nicknames given to CEO-DARKBANK on another chat site that also link **Ismail** to the account, such as:

  - "CEO huzaif" (apparently corresponding to **Ismail's** first name)

  - Money Dxb ("DXB" is the airport code for Dubai, where **Ismail** has maintained a residence since 2017)

  - "amrk" and "US Money Man" (consistent with **Ismail's** American citizenship)

  - "Watch man" (consistent with information obtained by French authorities revealing that **Ismail** owns a company selling luxury watches via the website quintessential.ae).[12]

The extradition packet, Dkt. 27, contains France's summaries of additional evidence it obtained in its investigation. To avoid unnecessary duplication, the government incorporates the facts contained in that document into this memorandum. The facts presented by France in its request are sufficient to establish probable cause that **Ismail** committed the crimes charged.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the United States requests that the Court determine that

---

[11] *See id.* at 71.

[12] *See id.* at 71-72, 74.

the information presented by France is sufficient to sustain the charges under the

provisions of the applicable Treaty and certify the extradition of **Ismail** for those charges

to the Secretary of State for possible surrender to France.


Dated: February 6, 2025                    Respectfully submitted,

                                           CHAD E. MEACHAM
                                           ACTING UNITED STATES ATTORNEY


                                           _____
                                           MATTHEW WEYBRECHT
                                           Assistant United States Attorney
                                           Texas State Bar No. 24102642
                                           Telephone: 817-252-5200
                                           Fax: 817-252-5455
                                           matthew.weybrecht@usdoj.gov


                          CERTIFICATE OF SERVICE

        I hereby certify that on February 6, 2025, I electronically filed the foregoing
document with the clerk for the U.S. District Court, Northern District of Texas, using the
electronic case filing system of the court. The electronic case filing system sent a "Notice
of Electronic Filing" to the attorney(s) of record who consented in writing to accept this
Notice as service of this document by electronic means.

                                           */s/ Matthew Weybrecht*
                                           MATTHEW WEYBRECHT
                                           Assistant United States Attorney